UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**ANTHONY COLON,**

> **Plaintiff,**

**v.**                                              **Case No.  6:21-cv-256-CEM-EJK**

**WENDELL SMITH and RONALD
RASLOWSKY,**

> **Defendants.**

_____/

## ORDER

THIS CAUSE is before the Court on Defendant, Corporal Ronald Raslowsky's Motion for Summary Judgment ("Raslowsky's Motion," Doc. 19), to which Plaintiff filed a Response (Doc. 23), and Raslowsky filed a Reply (Doc. 25); and Defendant, Deputy Wendell Smith's Motion for Summary Judgment ("Smith's Motion," Doc. 20), to which Plaintiff filed a Response (Doc. 24), and Smith filed a Reply (Doc. 26). For the reasons stated herein, Raslowsky's Motion will be granted in part and denied in part and Smith's Motion will be denied.

### I.    BACKGROUND

This case arises from an interaction between Defendants, who are police officers with the Orange County Sheriff's Office, (Raslowsky Dep., Doc. 19-2, at 5; Smith Dep., Doc. 19-3, at 4), and Plaintiff, an individual who lives and works in

Orlando, (Pl.'s Dep., Doc. 19-1, at 6–7, 10–11). On the day of the incident, Defendants were responding to a 911 call at an apartment complex in Orlando where the 911 caller reported a physical and verbal altercation in the apartment next door to her. (911 Call, Doc. 19-11; Doc. 19-2 at 8; Doc. 19-3 at 6). Around the same time, Plaintiff was arriving at the apartment complex to pick up his friend, Craig Jackson, to give him a ride to work. (Doc. 19-1 at 19–20). When Plaintiff arrived at the apartment complex, he proceeded up the stairs to Jackson's apartment, but Jackson was already on his way down the stairs, so the two "met on the second floor." (*Id.* at 34).

Plaintiff and Jackson then proceeded down the stairs, and when they arrived at the bottom of the stairs they encountered two police officers, Smith and Raslowsky. (*Id.* at 38). One of the officers asked Plaintiff if he was Craig Jackson, to which Plaintiff responded that he was not. (*Id.* at 38–39). Plaintiff then walked away from Defendants a distance of approximately eight to ten feet, and one of the officers asked Jackson if he was Craig Jackson, to which he responded that he was. (*Id.* at 39). Defendants began questioning Jackson "about what was going on upstairs" in the apartment. (*Id.*). This questioning lasted for approximately one minute before Plaintiff started to video the interaction between Defendants and Jackson on his cell phone. (*Id.* at 39–41).

On the cell phone video, Raslowsky can be seen having a conversation with Jackson, with Jackson saying, "I'm not a child" and Raslowsky responding with "then stop acting like one." (Pl.'s Cell Phone Video, Doc. 19-4). Raslowsky then took an item from under Jackson's arm that he was carrying so that Smith could place Jackson in handcuffs with his hands behind his back. (*Id.*). Plaintiff, while still videoing the interaction between Defendants and Jackson, stated: "Why are you putting him under arrest? I don't understand." (*Id.*). In response, Raslowsky turned towards Plaintiff and said, "Stop. Stop," while holding up his open-palmed hand in a stopping motion. (*Id.*). Plaintiff interjected, saying, "No, seriously, he didn't do anything," and Raslowsky responded by saying, "He isn't under arrest, so stop." (*Id.*). At this point, Plaintiff and Raslowsky were talking over each other, with Plaintiff insisting that Jackson was "obviously" under arrest and Raslowsky saying that "no, obviously he's not." (*Id.*). Raslowsky clarified that Jackson was being put in handcuffs "for our safety." (*Id.*). During this interaction, Jackson was also speaking, saying "Yo, what am I under arrest for?" and generally verbally questioning why he was being placed in handcuffs. (*Id.*).

Raslowsky approached Plaintiff, who was still videoing, and asked him whether he was upstairs, and Plaintiff responded that he was not. (*Id.*). Raslowsky then asked Plaintiff, "Do you have ID?," because Plaintiff was "interjecting" himself into the interaction between Defendants and Jackson. (*Id.*). Raslowsky asked for

Plaintiff's identification multiple times, and each time Plaintiff responded with "Sir, can you please step away from me?" (*Id.*; Doc. 19-1 at 46 (noting that Raslowsky requested identification from Plaintiff "at least six times")). This was the point at which the cell phone video cut out. (Doc. 19-4).

Plaintiff contends that the video cut out because Raslowsky "attack[ed]" him, causing the phone to fall to the ground. (Doc. 19-1 at 47, 49, (stating that Raslowsky "attack[ed]" Plaintiff for his phone), 51 (noting that Raslowsky "tried to grab [Plaintiff's] hand" and "knocked the phone out of [Plaintiff's] hand")). Raslowsky describes this interaction differently, noting that he "grabbed [Plaintiff's] hand with the phone in it because [he] wanted to bring that hand behind his back," and Plaintiff "push[ed]" or "shoulder check[ed]" Raslowsky in response. (Doc. 19-2 at 13, 20; Smith Arrest Aff., Doc. 19-6, at 2 (stating that Plaintiff "pushed" Raslowsky "and entered into a fighting stance"); Raslowsky Supp. Incident Report, Doc. 19-7, at 2 (stating that Plaintiff "shoved" him, "taking a fighting stance"); Smith Suppl. Incident Report, Doc. 19-8, at 1 (stating that Smith permitted Plaintiff to call his mother after he was arrested, at which time Smith heard Plaintiff tell his mother, "Mom you know that I feel disrespected when someone gets into my personal space, so I pushed him because he shouldn't have tried to take my phone"); *id.* (stating that Smith observed Plaintiff "push[] . . . Raslowsky's upper chest with both of his hands")). Plaintiff and Defendants also disagree as to what occurred next, but the

parties agree that there was a physical altercation between Plaintiff and Defendants, which resulted in Plaintiff being tasered by Raslowsky and then handcuffed by Smith. (Doc. 19-1 at 55–62, 85–88; Doc. 19-2 at 21, 24, 32; Doc. 19-3 at 16–18; Witness Video, Doc. 23-7).

As a result of the encounter, Plaintiff was arrested and charged with battery on a law enforcement officer and resisting an officer with violence, charges which were eventually dropped. (Doc. 19-6 at 2; Nolle Prosequi, Doc. 23-5, at 1). Plaintiff filed the instant case, alleging twelve counts comprising six causes of action against each Defendant separately in their individual capacity—false arrest and unreasonable seizure, 42 U.S.C. § 1983 (Counts I and II); excessive force, 42 U.S.C. § 1983 (Counts III and IV); malicious prosecution, 42 U.S.C. § 1983 (Counts V and VI); false imprisonment (Counts VII and VIII); battery (Counts IX and X); and intentional infliction of emotional distress (Counts XI and XII). (Doc. 1 at 5–22). Each Defendant moves for summary judgment on all counts brought against them. (*See generally* Doc. Nos. 19, 20).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.*

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). However, when faced with a "properly supported motion for summary judgment," the nonmoving party "must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (citing *Anderson*, 477 U.S. at 248–49 (1986)); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[T]he proper inquiry on summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law.'" *Stitzel v. N.Y. Life Ins. Co.*, 361 F. App'x 20, 22 (11th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251–52). Put another way, a motion for summary judgment should be denied only "[i]f reasonable minds could differ on the inferences arising from undisputed [material] facts." *Pioch v. IBEX Eng'g Servs.*, 825 F.3d 1264, 1267 (11th Cir. 2016) (quoting *Allen*, 121 F.3d at 646).

### III.   ANALYSIS

#### A.   Local Rule 1.08 Violations

As a preliminary procedural matter, Plaintiff's Responses violate Local Rule 1.08, which sets forth the requirements for the form of a pleading, motion, or other paper. That Rule requires that a filing with the Court must have one-inch margins, 14-point font for the main text when Times New Roman typeface is used, and 12-point font for footnotes when Times New Roman typeface is used. M.D. Fla. R. 1.08(a), (b). Plaintiff has clearly reduced the margins and font size in his Responses in an effort to not exceed the page limit for a response. (*See, e.g.*, Doc. 23 at 1–20 (showing 13-point Times New Roman typeface for the main text); *id.* at 12 n.1 (showing 9.5-point Times New Roman typeface for the footnote); *id.* at 3 (showing left and right margins of less than one inch and a top margin of less than one-half inch); *see generally* Doc. 24 (showing the same formatting violations)).

Counsel for Plaintiff who signed the offending Responses, Mr. Carlus Haynes, is warned that the Court will not tolerate such rule violations. *Colon v. Twitter, Inc.*,

No. 6:18-cv-515-Orl-41GJK, 2019 U.S. Dist. LEXIS 239981, at *11 (M.D. Fla. Dec. 2, 2019) (sanctioning counsel for similar rule violations). For the purposes of judicial efficiency, the Court will consider Plaintiff's Responses instead of striking them. However, the Court will not consider any text included in the footnotes because of the blatant rule violation. (Doc. 23 at 12 n.1, 13–14 n.2, 15 n.3, 18 n.4 (showing footnotes in 9.5-point Times New Roman typeface instead of the required 12-point typeface); Doc. 24 at 12 n.1, 13–14 n.2, 15 n.3, 17 n.4 (same)); M.D. Fla. R. 1.08(b) (requiring that footnotes in Times New Roman typeface be "at least 12-point"); *see also Brady v. Medtronic, Inc.*, No. 13-cv-62199-RNS, 2014 WL 1377830, at *8 n.1 (S.D. Fla. Apr. 8, 2014) ("A footnote is the wrong place for substantive arguments on the merits of a motion." (quotation omitted)). Additionally, Mr. Haynes is advised that in the future the Court will strike filings that violate the local rules.

### B.    Qualified Immunity

Moving on to the substantive issues, both Defendants assert that they are entitled to qualified immunity on all counts asserted against each of them. "Qualified immunity balances two important interests, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A police officer accused of a § 1983

violation "is entitled to raise the affirmative defense of qualified immunity," *Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018), which "is a legal issue to be decided by the court," *Cottrell v. Caldwell*, 85 F.3d 1480, 1488 (11th Cir. 1996). To raise the defense of qualified immunity, an officer must first "establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Estate of Cummings v. Davenport*, 906 F.3d 934, 940 (11th Cir. 2018) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998)). If the officer demonstrates that he was acting within his discretionary authority, then the burden shifts to the plaintiff to establish that the officer "violate[d] a statutory or constitutional right that was clearly established at the time the alleged violation took place." *Waldron v. Spicher*, 954 F.3d 1297, 1303 (11th Cir. 2020) (quoting *Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013)); *Pearson*, 555 U.S. at 232.

### 1. Discretionary Authority

The Court first considers whether Defendants were acting within their discretionary authority at the time of the alleged violations of Plaintiff's rights. To determine whether an officer was engaged in a discretionary function, the Court considers whether the officer's acts "are of a type that fell within the employee's job responsibilities." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir.

2004)). The officer must show that the challenged actions were: "(1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority." *Harbert Int'l*, 157 F.3d at 1282.

Each Defendant argues that "it is undisputed that [he] was acting within his discretionary capacity when he confronted the Plaintiff." (Doc. 19 at 10; Doc. 20 at 10). Plaintiff counters that it "is a contested fact" that Raslowsky's or Smith's "discretionary duties would allow [them] to approach an innocent bystander who is lawfully in a public place where he has a right to be and arrest him because he is recording an officer and asking a question." (Doc. 23 at 9; Doc. 24 at 9).

"Responding to an emergency 911 call . . . is unequivocally within the scope of a deputy's job responsibilities and discretionary authority." *Jones v. Walsh*, No. 1:14-cv-2202-0DE, 2017 U.S. Dist. LEXIS 219025, at *8 (N.D. Ga. Jan. 31, 2017). As are the actions of "question[ing] witnesses, arrest[ing a person], and escort[ing that person] to the car and then to jail" "within the scope [and] discretionary authority" of a police officer. *Riebsame v. Prince*, 267 F. Supp. 2d 1225, 1237 (M.D. Fla. 2003). These are exactly the actions that Raslowsky and Smith were undertaking at the time of their interaction with Plaintiff—they were responding to a 911 call and attempting to question a witness. Based on the video evidence, Plaintiff was not just "an innocent bystander" simply "recording an officer and asking a question," (Doc. 23 at 9; Doc. 24 at 9), but rather he was interrupting Defendants' questioning of

Jackson and continued to do so even when told to stop by Raslowsky. Thus, Defendants were unequivocally acting within the scope of their discretionary authority at the time alleged unconstitutional conduct.

### 2. Clearly Established Constitutional Rights

The burden thus shifts to Plaintiff to establish that Defendants violated a statutory or constitutional right that was clearly established at the time the alleged violation took place. *Waldron*, 954 F.3d at 1303. "[T]he core qualified immunity analysis consists of two questions: (1) whether the [officer] violated the plaintiff's constitutional rights, and (2) if so, whether those rights were clearly established." *Id.* at 1304. These two inquires may be considered "in either order," *id.* (quoting *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013) (citing *Pearson*, 555 U.S. at 236)), and "the facts [are] viewed in the light most favorable to the plaintiff." *Knight v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) (quoting *McCullough*, 559 F.3d at 1205).

### a. Counts I and II—False Arrest and Unreasonable Seizure

Plaintiff brings Counts I and II for false arrest and unreasonable seizure, pursuant to "the Fourth and Fourteenth Amendments of the Constitution of the United States." (Doc. 1 at 6, 8). Viewed in a light most favorable to Plaintiff, these counts appear to encompass both the initial questioning of Plaintiff by Raslowsky as well as the subsequent arrest of Plaintiff by Smith.

As a preliminary matter, Defendants argue that "Plaintiff's assertion that the Fourteenth Amendment applies in the instant case is misguided."[1] (Doc. 19 at 11; Doc. 20 at 12). The Fourth Amendment provides that "[t]he right . . . against unreasonable searches and seizures, shall not be violated, . . . but upon probable cause." U.S. Const. amend. IV. And the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Eleventh Circuit has clarified which Constitutional Amendments apply to various § 1983 cases, explaining that "[w]hile the Fourth Amendment prevents the use of excessive force during arrests," *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 952 (11th Cir. 2019) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)), "and the Eighth Amendment serves as the primary source of protection against excessive force after conviction," *id.* (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)), "it is the Fourteenth Amendment that protects those who exist in the in-between—pretrial detainees," *id.* (citing *Garrett v. Athens-Clarke Cnty.*, 378 F.3d 1274, 1279 n.11 (11th Cir. 2004)).

Here, Plaintiff was an arrestee, not a pre-trial detainee, so Defendants are correct that the Fourth Amendment applies but the Fourteenth Amendment does not

---

[1] Plaintiff does not respond to this argument in his Responses, indicating that it is unopposed. *Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014); *Gailes v. Marengo Cnty. Sheriff's Dep't*, 916 F. Supp. 2d 1238, 1244 n.12 (S.D. Ala. 2013) ("A plaintiff that fails to address a claim challenged by a defendant does so at its peril, both because the Court may not detect defects in the defendant's position . . . and because . . . the Court will not on its own raise arguments to counter the defendant's case.").

insofar as Plaintiff was an arrestee and not a pre-trial detainee. However, the Court surmises that Plaintiff's reference to the Fourteenth Amendment is merely for the legal principle that the Fourth Amendment has been made applicable to the states through operation of the Fourteenth Amendment. *Payton v. New York*, 445 U.S. 573, 576 (1980). Without argument to the contrary, the Court proceeds under this presumption.

The Court now turns to the remainder of the qualified immunity analysis— whether Defendants violated a statutory or constitutional right that was clearly established. "It is clearly established that an arrest made without probable cause violates the Fourth Amendment," so the second prong is established. *Wilkerson v. Seymour*, 736 F.3d 974, 977 (11th Cir. 2013) (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998)). "An officer is entitled to qualified immunity, however, where the officer had 'arguable probable cause,' that is, where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." *Id.* at 977–78 (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990)). "Probable cause exists when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has

committed, is committing, or is about to commit an offense.'" *Id.* at 978 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)).

Raslowsky first argues that he "was not the arresting officer" but that "he did have reasonable suspicion to approach the Plaintiff and conduct an investigation." (Doc. 19 at 14). As to the first part of this argument, "[a]n officer cannot be held liable for false arrest under § 1983 if the officer did not participate in the actual arrest or was not in the chain of command supervising the arresting officer." *Diaz v. Miami-Dade Cnty.*, 849 F. App'x 787, 791 (11th Cir. 2021) (citing *Brown v. City of Huntsville*, 608 F.3d 724, 736–37 (11th Cir. 2010)). It is undisputed that Raslowsky's participation in Plaintiff's arrest was limited to the initial questioning of Plaintiff, the altercation between Plaintiff and Raslowsky, and tasering Plaintiff. Smith was the officer who restrained, handcuffed, and arrested Plaintiff. There are also no facts which would indicate that Raslowsky was in the chain of command or any supervisory role over Smith. However, Raslowsky does not present any argument as to whether tasering Plaintiff makes him a participant in the arrest of Plaintiff. Accordingly, the Court may not presume that Raslowsky was not the arresting officer.

Raslowsky's next related argument is that he had "reasonable suspicion to approach the Plaintiff and conduct an investigation." (Doc. 19 at 14). As noted above, the Fourth Amendment prohibits "unreasonable searches and seizures." U.S.

Const. amend. IV. However, "[t]he Fourth Amendment does not prohibit a police officer, 'in appropriate circumstances and in an appropriate manner [from] approach[ing] a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest'—these brief investigative detentions are commonly referred to as '*Terry* stop[s].'" *United States v. Gonzalez-Zea*, 995 F.3d 1297, 1302 (11th Cir. 2021) (alterations in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). "*Terry* and its progeny allow an officer to, 'consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Id.* (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

"Whether a search or seizure is reasonable 'depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Id.* (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)). The Supreme Court has established a two-part test to determine whether a *Terry* stop was reasonable—(1) was "the officer's action . . . justified at its inception?" and (2) was the stop "reasonably related in scope to the circumstances which justified the interference in the first place?" *Id.* (quoting *Terry*, 392 U.S. at 20).

The first prong "turns on whether the officers had a reasonable suspicion that the defendant had engaged in, was engaging in, or was about to engage in, a crime."

*Id.* (citing *Terry*, 392 U.S. at 20). To demonstrate reasonable suspicion, an officer "must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" of criminal activity.'" *Id.* (quoting *Wardlow*, 528 U.S. at 123 (quoting *Terry*, 392 U.S. at 27)). Reasonable suspicion "is not concerned with 'hard certainties, but with probabilities,'" *United States v. Lewis*, 674 F.3d 1298, 1304 (11th Cir. 2012) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)), and is a lesser standard than both probable cause and preponderance of the evidence, but "requires at least a minimal level of objective justification for making the stop," *Gonzalez-Zea*, 995 F.3d at 1302–03 (quoting *Wardlow*, 528 U.S. at 123). That is, reasonable suspicion may "be based on commonsense judgments and inferences about human behavior." *Id.* at 1303 (quoting *Wardlow*, 528 U.S. at 125).

Raslowsky explains that he was at the apartment complex in response to a 911 call that reported a physical and verbal altercation. Defendants had identified Jackson as a tenant coming down from the apartment in question. Plaintiff was accompanying Jackson coming down the stairs from the apartment. And once Defendants began questioning Jackson, Plaintiff continued to stay in proximity to Jackson and Defendants, while asking questions about the situation. The totality of these circumstances would suggest that Plaintiff knew Jackson and may have come down from Jackson's apartment and been involved in the altercation that triggered the 911 call. This is sufficient reasonable suspicion for Raslowsky to suspect that

Plaintiff may have been engaged in a crime, i.e., the altercation in Jackson's apartment. And requesting Plaintiff's identification to gain further information about his involvement is a routinely accepted practice during a *Terry* stop. *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 186 (2004) ("[I]t is well established that an officer may ask a suspect *to identify himself* in the course of a *Terry* stop." (emphasis added)); *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993) ("During a *Terry* stop, officers may ask a suspect *to identify himself* or herself." (emphasis added)).

Plaintiff, who is Hispanic, argues that it was not reasonable for Raslowsky to suspect that Plaintiff was "the subject of the investigation" because Raslowsky "had the subjects name and a description of the subjects as being black males" and because "[t]he caller did not describe any of the parties involved as Hispanic males."[2] (Doc. 23 at 9; 911 Call Report, Doc. 23-1, at 2 (identifying the subjects as black males but noting that the caller "has no visual only hears")). Plaintiff's argument takes a single statement of the 911 call out of context. The relevant portion of the call is as follows:

> 911 Dispatcher: Is it male or female?
> 911 Caller: Males.
> 911 Dispatcher: Two males.
> 911 Caller: Yes.
> . . .

---

[2] Plaintiff also makes this argument as to Smith, (Doc. 24 at 9), but the Complaint does not allege that Smith was involved in the *Terry* stop of Plaintiff, (Doc. 1 at 5–7).

911 Dispatcher: Can you see them?
911 Caller: No, I can't. I'm in my room. I can hear them.
[The 911 caller then indicates that she is in the apartment
next door.]
. . .
911 Dispatcher: Do you know what they might look like?
911 Caller: No, I don't know them. [Unintelligible].
There's a couple people stay up there. I don't know who
all stay up there.
. . .
911 Dispatcher: Do you know if they are black, white, or
Hispanic?
911 Caller: They're black.
. . .
911 Dispatcher: Okay, have you ever seen them before?
911 Caller: Yeah, they stay over me. I see them. A whole
bunch of people stay up there.
911 Dispatcher: Okay, how many stay there?
911 Caller: I don't know.

(Doc. 19-11). The caller repeatedly indicated that she did not know what the people

in the apartment looked like because she was not witnessing the altercation and was

only hearing it. The caller also indicated that multiple people commonly stayed in

the apartment in question and that she did not know who or how many in particular

could be in the apartment. This information, paired with Defendants' observation of

Plaintiff and Jackson coming down the stairs together from the direction of the

apartment, supports Defendants' "commonsense judgment," *Gonzalez-Zea*, 995

F.3d at 1303, that Plaintiff could have been involved in the altercation in the apartment that Defendants were present to investigate.[3]

Thus, Raslowsky had reasonable suspicion to conduct a *Terry* stop of Plaintiff and request his identification. This temporary seizure does not violate the Fourth Amendment. Accordingly, Raslowsky is entitled to summary judgment on Count II to the extent that Plaintiff alleges an unreasonable seizure for the initial *Terry* stop.[4]

Moving on to the restraint and arrest of Plaintiff, Defendants argue that "[a]t minimum," they had arguable probable cause to detain and arrest Plaintiff for violation of section 843.02, Florida Statutes. (Doc. 19 at 16; Doc. 20 at 15). Section 843.02 provides that "[w]hoever shall resist, obstruct, or oppose any officer . . . in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree." This offense, known as "obstruction without violence," "is supported if an individual obstructs an officer in the lawful performance of his or her legal duty." *C.E.L. v. State*, 24 So. 3d 1181, 1188 (Fla. 2009) (citing Fla. Stat. § 843.02); *Storck v. City of Coral Springs*, 354 F.3d 1307, 1315 (11th Cir. 2003). This argument is made in light of the legal authority that an arrest "is constitutionally valid" when an officer has

---

[3] Plaintiff also asserts that "Raslowsky even though he does not admit it more than likely watched the Plaintiff arrive and walk upstairs and immediately walk back downstairs after meeting Mr. Jackson in the stairwell." (Doc. 23 at 9–10). However, Plaintiff provides absolutely no evidence to support this argument, so it will not be addressed further by the Court.

[4] The portion of Count II alleging false arrest against Raslowsky is unaffected by this finding.

"probable cause to arrest for *any* crime." *Elmore v. Fulton Cnty. Sch. Dist.*, 605 F. App'x 906, 914 (11th Cir. 2015) (emphasis added) (citing provide *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).

As discussed above, Defendants were clearly acting within the scope of their job responsibilities when they were responding to the 911 call and questioning Jackson and Plaintiff. *See Storck*, 354 F.3d at 1315 (discussing the "[j]ob functions that qualify as falling within the ambit of 'the lawful execution of any legal duty' under Florida law" (quoting Fla. Stat. § 843.02)). Therefore, the issue is whether Plaintiff was obstructing that legal duty. As applicable to a charge of obstruction without violence, "Florida courts have generally held, with very limited exceptions, that physical conduct must accompany offensive words to support a conviction under § 843.02." *Davis v. Williams*, 451 F.3d 759, 765 (11th Cir. 2006) (collecting cases). "[A] person's exercise of free speech, without more, in an open public place while an officer is engaged in the execution of a legal duty must do more than merely irritate, annoy, or distract the officer to constitute a crime." *D.A.W. v. State*, 945 So. 2d 624, 627 (Fla. 2d DCA 2006). In other words, "there is a 'distinction between verbal harassment and obstructive conduct' in that the offense of obstruction of justice cannot 'infringe upon rights of free speech under the First Amendment.'" *Ford v. City of Boynton Beach*, 323 So. 3d 215, 227 (Fla. 4th DCA 2021) (quoting *D.A.W.*, 945 So. 2d at 626–27).

Here, Plaintiff was eight to ten feet away from Defendants while they were questioning Jackson. Plaintiff was directing questions to Defendants and generally verbally opposing them putting Jackson in handcuffs, all while videoing the interaction on his cell phone. Further, Plaintiff was clearly instructed by Raslowsky several times to "stop," an order with which Plaintiff did not comply. Upon a review of the applicable legal authority, it is unsurprising to discover that Plaintiff is not the first third-party to verbally interject himself into a police investigation, often in an annoying or obnoxious manner, but courts have consistently found such behavior to be insufficient to support probable cause. *J.G.D. v. State*, 724 So. 2d 711, 712 (Fla. 3d DCA 1999) (collecting cases where words alone were insufficient probable cause for arrest on a charge of obstruction without violence); *c.f. H.A.P. v. State*, 834 So. 2d 237, 239 (Fla. 3d DCA 2002) (noting that the defendant "was not arrested for yelling profanities" but rather "because his actions interfered with the law enforcement officers' execution of the search warrant").

Two cases in particular are analogous to the instant undisputed facts. In *J.G.D. v. State*, "the court held that no probable cause for arrest for obstruction existed despite a police order directing the defendant to leave an apartment complex, despite the defendant's 'loud and profane' protests, and despite the gathering of an 'unruly crowd.'" *Davis*, 451 F.3d at 765 (quoting *J.G.D.*, 724 So. 2d at 711). In *L.A.T. v. State*, the appellate court reversed the trial court on a charge of obstruction

without violence despite the defendant "loudly and profanely protest[ing] what he thought was the abusive conduct of the police." 650 So. 2d 214, 218 (Fla. 3d DCA 1995). Thus, despite Plaintiff obviously interrupting Defendants' questioning of Jackson and continuing to do in defiance of Raslowsky directing him to stop, this conduct—without more—does not rise to the level of arguable probable cause necessary to support an arrest for obstruction without violence. *D.G. v. State*, 661 So. 2d 75, 76 (Fla. 2d DCA 1995) ("If a police officer is not engaged in executing process on a person, is not legally detaining that person, or has not asked the person for assistance with an ongoing emergency that presents a serious threat of imminent harm to person or property, the person's words alone can rarely, if ever, rise to the level of an obstruction.").

The remainder of Defendants' arguments as to Counts I and II rely on the proposition that Plaintiff "touched or struck Corporal Raslowsky in an effort to evade him." (Doc. 19 at 16; Doc. 20 at 15). However, this is a disputed material fact, with Plaintiff contending that Raslowsky initiated the altercation and Defendants contending that Plaintiff initiated the altercation. (*See also* Doc. 19 at 17 (arguing that "Plaintiff's story does not add up with the statements of those who were also present," which is an indirect concession by Defendants that there are disputed material facts)). Accordingly, summary judgment is due to be denied based upon any argument that turns on this disputed fact. In summary, Defendants' request for

summary judgment will be denied as to Counts I and II, except that summary judgment will be granted as to Raslowsky insofar as Count II alleges an unconstitutional seizure with regard to the *Terry* stop.

          b.      <u>Counts III and IV—Excessive Force; Counts IX and X—</u>
<u>Battery; and Counts XI and XII—Intentional Infliction of</u>
<u>Emotional Distress</u>

Counts III and IV allege excessive force during Plaintiff's arrest by Smith and Raslowsky, respectively; Counts IX and X allege state common law battery claims against Smith and Raslowsky, respectively; and Counts XI and XII allege state common law claims for intentional infliction of emotional distress against Smith and Raslowsky, respectively. Counts III and IX are premised upon the allegation that Smith "attacked the Plaintiff" during the course of an unlawful seizure and arrest, (Doc. 1 at 10, 19 (emphasis omitted)), while Counts IV and X allege that Raslowsky "attacked the Plaintiff" during the course of an unlawful seizure and arrest, (*id.* at 11, 19 (emphasis omitted)). Counts XI and XII are also premised upon facts surrounding the physical altercation and Defendants' arrest of Plaintiff. As explained above in the analysis of Counts I and II, who instigated the initial physical contact between Plaintiff and Raslowsky is an issue of disputed fact, and these facts are material to determining whether Defendants' subsequent use of force was

appropriate. Therefore, summary judgment will be denied as to Counts III, IV, IX, X, XI, and XII.

c.    <u>Counts V and VI—Malicious Prosecution; and Counts VII and VIII—False Imprisonment</u>

Counts V and VI allege malicious prosecution by Smith and Raslowsky, respectively; and Counts VII and VIII allege false imprisonment by Smith and Raslowsky, respectively. All of these counts are premised upon the allegation that Defendants' arrest of Plaintiff was not supported by probable cause. As discussed above as to Counts I and II, whether Defendants' arrest of Plaintiff was constitutional cannot currently be resolved because there are disputed issues of material fact. Therefore, summary judgment will be denied as to these counts.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant, Corporal Ronald Raslowsky's Motion for Summary Judgment (Doc. 19) is **GRANTED in part** and **DENIED in part**.

   a. The Motion is granted as to Count II insofar as it alleges an unconstitutional seizure in regard to the *Terry* stop.

   b. The Motion is otherwise denied.

2. Defendant, Deputy Wendell Smith's Motion for Summary Judgment (Doc. 20) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on November 9, 2022.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record